# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No.:

CAROLYN O'NEAL,

      Plaintiff,

v.

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF FREMONT;
SHERIFF JAMES BEICKER, in his individual and official capacities;
TY MARTIN, in his individual and official capacities;
MICHAEL FETTERHOF, in his individual and official capacities;
TROY JOHNSTON, in his individual and official capacities;
STEVE SANGER, in his individual and official capacities;
MICHAEL ULRICH, in his individual and official capacities;
RICHARD SOLANO, in his individual and official capacities;
CARRIE HAMMEL, in her individual and official capacities;
CAMERON GONZALES, in his individual and official capacities;
JOSHUA POHL, in his individual and official capacities;
DEBORA BUNCH, in her individual and official capacities;

      Defendants.

_____

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

_____

      Plaintiff, Carolyn O'Neal, by and through counsel, David Lane and Eudoxie (Dunia)

Dickey of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for her Complaint and Jury

Demand as follows:

# I.   INTRODUCTION

1.      This action arises out of the Fremont County Sheriff's Office (FCSO) Deputy

Michael Fetterhoff's, Sergeant Troy Johnston's and Sergeant Steve Sanger's false arrest/unlawful

seizure of and excessive force against Plaintiff Carolyn O'Neal on or about May 5, 2014, and

Ms. O'Neal's subsequent illegal detainment and excessively forceful treatment at the hands of

Defendants FCSO correctional officers Michael Ulrich, Richard Solano, Carrie Hammel,

Cameron Gonzales, Joshua Pohl and Debora Bunch at the Fremont County Detention Center,

located at 100 Justice Center Road in Cañon City, Colorado (the "Jail").

2.      Motivated by a desire to retaliate against Ms. O'Neal for her constitutionally-

protected expressions of protest at their illegal law enforcement misconduct, and without

probable cause, Defendants unlawfully seized and arrested the nude Ms. O'Neal while

performing a welfare check, paraded her naked outside and then took her to the Jail, where she

remained completely nude for another twelve (12) hours.  During this illegal and totally

unjustified detainment, Defendants treated Ms. O'Neal like an animal, kept her restrained in a

restraint chair—clothed in only a spit mask—and excessively forcefully applied a "hypoglossal

pressure point" compliance technique and tased her twice at close range on her upper right leg in

"drive stun mode" to shut her up and in further retaliation for Ms. O'Neal's threats that she

would remember Defendants' names and they would lose their jobs because of their completely

illegal and unjustified actions.  At all relevant times, Defendants acted pursuant to the custom,

policy and practice of Fremont County and violated numerous of Ms. O'Neal's rights guaranteed

by the First, Fourth and Fourteenth Amendments to the United States Constitution as well as her rights under the Americans with Disabilities Act.

## II. JURISDICTION AND VENUE

6.      This action arises under the Constitution and laws of the United States and the State of Colorado, and is brought pursuant to Title 42 U.S.C. § 1983.

7.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

8.      Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

9.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

## III.    PARTIES

**Plaintiff**

10.      Plaintiff, Carolyn O'Neal, is a citizen of the United States and was at all times relevant hereto a resident of and domiciled in the State of Colorado.

**Defendants**

6.      Fremont County is a governmental entity chartered under the laws of the State of Colorado.  Among other things, Fremont County operates the Fremont County Detention Center ("the Jail"), located at 100 Justice Center Rd. in Cañon City, Colorado.

7.      Defendant Board of County Commissioners of the County of Fremont represents, oversees, and sets policy for Fremont County, Colorado.  Under Colo. Rev. Stat. § 30-11-105, the Board of County Commissioners of the County of Fremont is the proper party to name in an action against Fremont County.

8.      At all times relevant to this Complaint, Defendant Sheriff James Beicker and Defendant Undersheriff Ty Martin, respectively, were each a citizen of the United States, resident of and domiciled in the State of Colorado and were each acting under color of state law in their capacities as the Fremont County Sheriff and Fremont County Undersheriff, respectively, employed by the Fremont County Sheriff's Office.  Defendant Sheriff James Beicker and Defendant Undersheriff Ty Martin, in their respective official capacities, are each a final policymaker for Fremont County with respect to all matters concerning the Fremont County Sheriff's Office and all of its divisions, including the Fremont County Detention Center.

9.      Defendants Board of Commissioners of the County of Fremont, Sheriff James Beicker and Undersheriff Ty Martin are collectively referred to as "the Fremont County Defendants."

10.     At all times relevant to this Complaint, Defendant Deputy Michael Fetterhoff, Defendant Sergeant Troy Johnston, Defendant Sergeant Steve Sanger, Defendant Sergeant Michael Ulrich, Defendant Corporal Richard Solano, Defendant Sergeant Carrie Hammel, Defendant Deputy Cameron Gonzales, Defendant Deputy Debora Bunch, and Defendant Deputy Joshua Pohl, respectively, were each a citizen of the United States, resident of and domiciled in the State of Colorado and were each acting under color of state law in their respective capacities as law enforcement officers employed by the Fremont County Sheriff's Office.

## IV.     FACTUAL ALLEGATIONS

### A.  MS. O'NEAL'S LIFE

11.     Ms. O'Neal was born in Mexia, Texas on August 3, 1964.

4

12.     At the time of her unlawful arrest and detainment, Ms. O'Neal was 49 years old.

13.     Ms. O'Neal is a petite woman, weighing just 123 pounds with a stature of 5 feet, 3 inches.

14.     Ms. O'Neal is a proud mother and grandmother.  She has three children, Bradley (Brad), 28, Mindy, 26, and Jody, 20, and two grandchildren, Brody, 4, Benjamin, 9 months, with a granddaughter due in July 2016.

15.     Ms. O'Neal was married for over thirty (30) years, but when her marriage fell apart and she left her husband in August 2010, her health declined and she began to struggle financially.

16.     Following the end of her marriage, Ms. O'Neal held several jobs, including at Petco and City Market in Cañon City, Colorado, but eventually she was no longer able to work due to severe spine problems.  Ms. O'Neal has had several back surgeries and her neck is fused together.

17.     Ms. O'Neal has not been blessed with good health.  She suffers from a number of medical conditions, including but not limited to Panic Anxiety Disorder; Posttraumatic Stress Disorder (PTSD); Degenerative Disk Disease; Spinal Stenosis; Spinal Fusion of C-Spine 5, 6 and 7; Pinched Nerves, Bulging and Disk Herniation; Neuropathy; Radiculopathy; Osteoarthritis; Chronic Obstructive Pulmonary Disease (COPD); Hepatitis C; Dysplasia; Carpal Tunnel Syndrome; Ulcerative Colitis; and Acute Pancreatitis.

18.     While homeless and living in Grand Junction, Colorado, Ms. O'Neal was the

victim of domestic violence at the hands of an abusive boyfriend.  She was beaten, burned with a

cigarette and suffered a broken arm.

19.     Ms. O'Neal moved to Cañon City, Colorado to escape her abusive boyfriend, be

near her daughter Mindy and help take care of her grandson Brody**.**

20.     Due in part to her physical inability to work, prior to living at New Creations Inn,

Ms. O'Neal was briefly homeless, living in her car and struggling with Substance Use Disorder.

21.     Despite these challenges, Ms. O'Neal was determined to turn her life around in

order to help support her daughter and grandson.

22.     In October 2013, Ms. O'Neal checked herself into the New Creations Inn, a sober

living facility in Cañon City, Colorado, out of a renewed commitment to her health and sobriety.

23.     At the time of her unlawful arrest, Ms. O'Neal was attending Alcoholics

Anonymous (AA) meetings daily, as she does currently.

24.     Throughout her life, Ms. O'Neal has suffered from diagnosed Panic Anxiety

Disorder and PTSD stemming from certain traumatic events she endured in her childhood.  The

abuse she suffered led her to be homeless by the age of twelve (12).

25.     At the time of her unlawful arrest, Ms. O'Neal was receiving therapy and

medication treatment for her Panic Anxiety Disorder and PTSD from a clinician at West Central

Mental Health Center (now Solvista Health) in Cañon City, Colorado.  Ms. O'Neal continues to

work with a clinician at Solvista Health to address these conditions.

26.      In the months following her arrest and detainment, Ms. O'Neal successfully

applied for full Social Security Disability (SSD) on the basis of severe back problems and PTSD.

She remains on full SSD and currently lives in low-income housing in Cañon City, Colorado.

27.      In early 2014, Ms. O'Neal's mother was diagnosed with advanced stage pancreatic

cancer.

28.      When Ms. O'Neal discovered that her mother had very little time left to live, she

began preparing to leave New Creations Inn and relocate to Grand Junction, Colorado to take

care of her dying mother.

29.      On May 5, 2014, as Ms. O'Neal packed her belongings with the help of her fellow

resident, Timothy Ford, she received a call from her sister, Laura Kay Jones, who informed Ms.

O'Neal that doctors had decided their mother's late-stage cancer had progressed too far and they

would be unable to proceed with a planned life-saving surgery.

30.      Understandably, this news proved a devastating blow, and Ms. O'Neal was in

despair.  As Ms. O'Neal bewailed her dying mother, Mr. Ford became worried.

31.      Upon information and belief, Mr. Ford was a resident at New Creations Inn at

least in part because he has difficulty with communication.  In misinterpreting Ms. O'Neal's

grief, Mr. Ford became convinced that Ms. O'Neal intended to harm herself based on an off-hand comment that she might be better off if she drove her Jeep off a cliff.

32.     Mr. Ford reported the incident to two staff members at New Creations Inn, Caseworker Lois Anne Largent and Program Director Alan Donald.

33.     Mr. Ford, Ms. Largent and Mr. Donald then attempted to speak with Ms. O'Neal at her apartment.

34.     Ms. O'Neal, who was still on the phone with her sister as the two communicated with their mother's doctors, asked Ms. Largent and Mr. Donald to leave her alone, as she had no desire to be interrupted while in the midst of a crisis.

35.     Knowing that Ms. O'Neal had recently started taking new medication, Mr. Ford was worried about her safety, and that she declined to speak with staff members, Mr. Donald called the police to perform a welfare check and ensure Ms. O'Neal's safety.

## B.  MS. O'NEAL'S UNLAWFUL ARREST AND DETAINMENT

36.     At approximately 12:28 P.M. on May 5, 2014, Deputy Michael Fetterhoff of the FSCO was dispatched to New Creations Inn to check on Plaintiff.

37.     Deputy Fetterhoff arrived at New Creations Inn at approximately 12:32 P.M.

38.     Sergeant Steve Sanger and Sergeant Troy Johnston joined Deputy Fetterhoff at New Creations Inn shortly thereafter.

39.     These three officers had been informed by New Creations Inn staff that Plaintiff allegedly had said she might be better off if she drove her Jeep off a cliff.

8

40.    In a Motions Hearing regarding Plaintiff's false criminal charges, held on August

5, 2014 before Fremont County Judge Norman S. Cooling (the "Motions Hearing"), Sergeant

Johnston admitted that, based on the suicidal threats made to Mr. Ford, Plaintiff should have

been taken to a medical facility following the welfare check.  However, at the time the officers

responded, FSCO staff had "no formal training on how to handle suicide threats."

41.    At the moment the officers arrived, Plaintiff was still speaking with her sister on

speakerphone as she was getting undressed and preparing to take a bath, in the hopes calming

down from the day's already stressful events.

42.    When the three Defendants knocked on her door, Plaintiff informed them she was

naked and repeatedly told them to leave.

43.    Disregarding Plaintiff's lack of consent, the Defendant officers ordered the

Program Director, Mr. Donald, to give them the keys to Plaintiff's apartment and began to unlock

her door.

44.    Prior to entering her apartment, none of the three Defendant officers offered

Plaintiff an opportunity to get dressed before barging in uninvited.

45.    As soon as the Defendants unlocked the door without probable cause, a warrant,

her consent or any exigent circumstances, Plaintiff immediately protested the Defendants' illegal

entry and yelled forcefully that she was naked and the police had no right to enter her home.

46.     Instead of leaving Plaintiff's residence, or even shutting the door and giving her a few moments to dress, the three male officers—dressed in full uniform and equipped with sidearms, handcuffs, Tasers and expandable batons—remained inside her apartment with the door open while she stood stark naked and screamed at them to leave, yelling loudly and clearly throughout the encounter, "Nobody invited you in!" "You were not invited!  I did not let you in!" "You need to go outside!" and "You go outside my door and talk to me!"

47.     Upon their unlawful entry, Plaintiff immediately informed the Defendants that "I ain't … [indiscernable] to harming myself!" in an effort to communicate that she had no intention of harming herself.

48.     During the Motions Hearing, Defendant Johnston admitted that as he did not find Plaintiff in her Jeep, but rather inside her apartment, he was not worried at the time that she was imminently going to drive her Jeep off a cliff or otherwise harm herself.

49.     When the officers refused to leave, Plaintiff became even more upset and started yelling more loudly.

50.     Throughout this encounter, none of the Defendants attempted to soothe or comfort Plaintiff, despite their knowledge that she was in a mentally vulnerable state, having made a possible suicide threat requiring a welfare check—the only reason for Defendants' presence.

51.     Indeed, the Defendants' words and actions triggered Plaintiff's Panic Anxiety Disorder and PTSD from earlier traumatic life events, serving only to further destabilize her mental health and vulnerable state of mind.

52.     Next, in retaliation for Plaintiff's constitutionally protected First Amendment expression of protest at the Defendants' official misconduct in unlawfully entering her home, the Defendants proceeded to handcuff and arrest Plaintiff.

53.     When Defendant Johnston's yelling did not quiet her, he ordered Plaintiff to "turn around."

54.     Defendant Sanger then announced "We're going to detain you until… we find out what's going on" and ominously threated "You're going to get tased, Carolyn."

55.     Unsurprisingly, the Defendants' threats of violence did nothing to calm Plaintiff and only served to escalate the situation further.

56.     During the Motions Hearing, Defendant Johnston admitted that as a law enforcement officer, he should not make threats or antagonize someone in a fragile mental state who was making suicidal threats.  He admitted that "you need to handle these situations delicately."

57.     As is evident from the officers' own incident reports and audio recording, the next six minutes involved a brutal, dramatic and completely unjustified detention.

11

58.     During the Motions Hearing, Sergeant Johnston admitted that at no point in time did Plaintiff make any threats to physically harm the officers or anyone else, nor did she make any movements toward the officers that would have indicated she was planning to harm them.

59.     Nevertheless, according to Defendant Fetterhoff's incident report, Defendant Johnston "grabbed [Ms. O'Neal] by her right arm and placed her against the bed" while Deputy Fetterhoff "grabbed [Ms. O'Neal] by the back of her head to hold her down and grabbed her left arm to assist Sergeant Johnston with cuffing [Ms. O'Neal]."

60.     As the still nude, diminutive female struggled against Defendant Johnston, she cried, "My mother is dying, and you just broke through my house, with me naked!"

61.     After these three hefty male officers threw Plaintiff's prone, naked body onto the bed, they held her down by the head, handcuffed her, threw a blanket over her body, and then asked her to "talk with" them.

62.     Plaintiff refused, continuing to yell at the officers, shouting "Don't talk to me.  No. You go outside my door to talk to me!"

63.     Eventually, the Defendants dragged Plaintiff to her feet, pulled her outside, humiliated her as they paraded her handcuffed and wrapped in only a blanket past friends and neighbors, and threw her in the back of a police vehicle.

64.     At no point during Plaintiff's arrest or detainment did Defendants Fetterhoff,

Johnston or Sanger advise her as to what offense she had committed, despite repeatedly telling

her she was being detained.

65.     Despite all of the information from the New Creations Inn staff suggesting

Plaintiff's need for medical attention, and her own clearly vulnerable, agitated and deteriorating

state of mind, Plaintiff was never placed in an ambulance nor taken to a hospital.  None of the

Defendants, nor any other staff at the Jail, ever called West Central Mental Health (now Solvista

Health) or other medical facility to request a clinical worker to meet with Plaintiff and evaluate

her state of mind and mental health.

66.     After the three officers forced Plaintiff into the police vehicle, Defendant

Fetterhoff drove her to the Jail in the back of his police vehicle.

67.     During her transport, Plaintiff continued to exercise her well-established

constitutionally protected right to protest illegal police misconduct, crying out to Defendant

Fetterhoff "What's you got to take me to jail for?  What did I do wrong?  You're the [expletive]

one that has [expletive] broke the law!" and "Busting through my house, [with me] [expletive]

naked!"

68.     When Plaintiff was brought to the Jail by Defendant Fetterhoff—despite the fact

that she had committed no crime—she was still handcuffed and completely nude except for a

blanket.

13

69.     None of Defendants Fetterhoff, Ulrich, Hammel, Solano, Gonzales, Pohl, or

Bunch, nor any other Jail staff, provided Plaintiff with a Jail uniform upon her arrival.

70.     As Defendant Fetterhoff arrived at the Jail sally port with Plaintiff in the back seat

at approximately 12:51 P.M. on May 5, 2014, Defendants Gonzales, Pohl, Bunch and Solano

made their way to the police vehicle.

71.     Having been triggered by her excessively forceful false arrest, Plaintiff's PTSD

caused her to become even more agitated as Defendant Bunch opened the police vehicle rear

door and roughly removed her from the police vehicle, as Plaintiff again protested "You all can

say whatever you want, busting through my house [with me] naked!"

72.     Shortly after Plaintiff exited the police vehicle, Defendants Gonzales and Solano

performed an excessively forceful takedown of Ms. O'Neal, pushing her 123-pound naked body

down onto the hard ground with their full bodyweights and unnecessarily roughly restraining her

as she lay prostrate and handcuffed behind her back.

73.     While Defendants Gonzales and Solano remained piled up on top of Plaintiff, she

continued to protest the Defendants' illegal police conduct, shouting "You're goddamn breaking

the law!"

74.     At approximately 12:53 P.M., Defendants Solano, Gonzales, Bunch and Pohl

excessively forcefully placed Plaintiff in an Emergency Restraint Chair ("restraint chair") and

violently uncuffed her and then secured her limbs, waist and shoulders into restraints, checking

them for tightness.

75.     One of the Defendants dug his knee into Plaintiff's back as he was securing her

restraints, to which Plaintiff retorted "Get your knee off my back!  I'm not gonna hurt nobody!"

She continued protesting the Defendants' illegal conduct, yelling "You [expletive] broke the law,

busting through my door!" and "Preserve the right of the innocent… really?!"

76.     In addition to constituting a serious violation of Plaintiff's Fourth and Fourteenth

Amendment constitutional rights to be free of excessive force, Defendants' actions in forcing

Plaintiff into a restraint chair directly from handcuffing her contravened the Jail's own Detention

Division Standard Operating Procedures Manual with respect to the Use of Force and Restraints

("Restraint SOP Manual").  The Jail's Restraint SOP Manual permits the use of Level 3 restraints

(including an Emergency Restraint Chair) only after "follow[ing] a continuum of escalation

restraints" from Level 1 restraints (including handcuffs) to Level 2 restraints (including regular

metal handcuffs, hinge metal handcuffs, flex cuffs, and leather soft wrist cuffs in combination

with waist belt belly chains, leather soft ankle cuffs, or leg irons).  Pursuant to the Jail's own

Restraint SOP Manual, any departure from this sequential restraint escalation continuum, such as

placing an inmate in Level 3 restraints directly from Level 1 restraints, must be approved by the

Detention Division Commander or designee.  When restraint equipment is used, officers are

required to complete a "Use of Force/ Restraint Data form" and use of any Level 3 restraints

(including an Emergency Restraint Chair) must be documented in a Master Control Daily Log.

77.    Defendants violated the Jail's Restraint SOP Manual by escalating Plaintiff's

restraints directly from Level 1 to Level 3 without first obtaining the approval of the Detention

Division Commander and failing to complete a "Use of Force/ Restraint Data form."

78.    As noted in the Fremont County Sheriff's Office Custody II Deputy Report Form,

Ms. O'Neal was unable to sign to confirm the items in her personal possession (Clothing Worn:

"1 Blanket") when she arrived because she was "In Restraint Chair."

79.    Next, to shut her up and in further retaliation for her continuing constitutionally

protected expressions of protests of Defendants' law enforcement misconduct, including

Plaintiff's threats that she would remember Defendants' names and they would lose their jobs,

Defendants Gonzales and Bunch placed a spit mask over Plaintiff's head, which was not

removed for several hours.

80.    At approximately 1:09 P.M., Plaintiff managed to free her legs from the leg

restraints, and in doing so was able to cross her legs to protect her dignity.

81.    When approached by Jail staff, Plaintiff did not attempt to kick any of the

Defendants, but simply endeavored to keep her legs crossed, as she was still nude and covered

only by a suicide smock that repeatedly slid down, again and again exposing her naked body.

82.     Although Plaintiff could not possibly have posed a threat to herself or others while restrained in a restraint chair and covered in a spit mask, at approximately 1:11 P.M., Defendants Solano, Hammel, Gonzales, and Pohl entered her holding cell, surrounded Plaintiff, and proceeded to excessively forcibly coerce Plaintiff's legs back into leg restraints.

83.     When Plaintiff refused to allow her legs to again be pulled apart and placed in leg restraints, Defendant Pohl, under direction from Defendant Gonzales, excessively forcibly applied a "hypoglossal pressure point" compliance technique to Plaintiff's neck and jaw in order to compel her to replace her legs in restraints.

84.     The image below is a screenshot from Jail surveillance video of holding cell 3 at approximately 1:10 P.M. on May 5, 2014 which depicts Defendant Pohl applying a "hypoglossal pressure point" compliance technique to both sides of Plaintiff's neck while Defendants Gonzales, Solano and Hammel attempted to forcibly restrain Plaintiff's legs.



85.     When this technique failed to yield the Defendants' desired coercive result,

Defendant Ulrich, who had by this point joined the other Defendants, with excessive force tased

the nude, restrained Plaintiff twice in quick succession at close range on her right upper thigh in

"drive stun mode" for a duration of approximately 4-6 seconds each.

86.     The image below is a screenshot from Jail surveillance video of holding cell 3 at

approximately 1:11 P.M. on May 5, 2014 which depicts Defendant Ulrich leaning down and

tasing Plaintiff on her upper right leg at close range, while Defendants Gonzales, Pohl, Solano

and Hammel looked on.



87.    The Defendants' inhumane and indefensible use of force perpetrated upon

Plaintiff was motivated not by any reasonable perception that Plaintiff posed a security threat,

but instead by a vindictive desire to retaliate against Plaintiff for her continuing constitutionally

protected protests of their illegal conduct and to shut her up.

88.    Defendant's use of a Taser at close range left painful red burn marks the size of

pencil erasers on Plaintiff's right leg.

89.    In addition to constituting a gross violation of Plaintiff's Fourth and Fourteenth

Amendment constitutional right to be free of excessive force, Defendants' violent use of a Taser

upon Plaintiff's person violated the Jail's own Detention Division Standard Operating Procedure

Manual with respect to the use of an Electronic Restraint Device "TASER" ("Taser SOP

Manual") in at least the following ways:  (1) the Jail's Taser SOP Manual provides that Tasers

are "not to be used in any manner except in gaining control of non-compliant, belligerent,

violent, resistive subjects," yet Defendants tased Plaintiff for being only "verbally combative;" (2)

per the Jail's Taser SOP Manual, Tasers shall not be used on persons in wheelchairs, yet

Defendants tased Plaintiff while she was trapped in a device far more restrictive than any

wheelchair; (3) the Jail's Taser SOP Manual requires officers to take at least three (3)

photographs of the Taser impact site "as soon as feasibly possible," yet Defendants failed

altogether to photograph the red burn marks Defendant Ulrich's Taser left on Plaintiff's right leg.

90.    Defendants conspired to conceal the second incident of Taser use by reporting

only a single use of a Taser in their respective incident reports.  Additionally, in response to

undersigned counsel's request of Plaintiff's Jail records pursuant to the Colorado Open Records

Act, the Fremont County Sheriff's Office failed to furnish automatic electronic Taser reports that

would have confirmed the number and duration of tasing incidents.

91.    After she spent nearly four (4) hours in the restraint chair, Plaintiff's restraints

were finally removed and she was locked inside a cell. Plaintiff was left in that cell, alone and

naked, for approximately eight (8) hours before officers provided her with a jail uniform at approximately 12:53 A.M. on May 6, 2014.

92.     Aside from a desire to humiliate, punish and/or retaliate against Plaintiff for her constitutionally protected protest of Defendants' illegal law enforcement misconduct, there was absolutely no justifiable reason for Defendants to have forced Plaintiff to remain in the nude, in full sight of male deputies and other inmates, for a total of approximately twelve (12) hours.

93.     In addition to constituting an outrageous violation of Plaintiff's Fourteenth Amendment rights to be free of violations of her privacy and bodily integrity, Defendants' actions and inactions in forcing Plaintiff to remain completely nude in the Jail for approximately twelve (12) hours was also a flagrant violation of Colorado law respecting strip searches.  Under Colo. Rev. Stat. § 16-3-405 "Strip searches – when authorized or prohibited," a strip search is defined as "having an arrested person remove or arrange some or all of his or her clothing so as to permit a visual inspection of the genitals, buttocks, anus or female breasts of such person." Colo. Rev. Stat. § 16-3-405(2).  A strip search is purely visual in nature and thus can be said to have occurred any time officers remove (or fail to provide) an inmate's clothing and view such inmate in the nude.  Any peace officer who knowingly or intentionally fails to comply with any provision of this statute commits second degree official misconduct.  Colo. Rev. Stat. § 16-3-405(6).

94.     Defendants violated Colo. Rev. Stat. § 16-3-405 in at least the following ways: (i) Colo. Rev. Stat. § 16-3-405(1) provides that "[n]o person arrested for a traffic or a petty offense

shall be strip searched, prior to arraignment, unless there is reasonable belief that the individual

is concealing a weapon or a controlled substance or that the individual, upon identification, is a

parolee or an offender serving a sentence in any correctional facility in the state or that the

individual is arrested for driving while under the influence of drugs," but Defendants subjected

Plaintiff to a twelve (12) hour strip search even though she was allegedly arrested for a petty

offense and Defendants had no reasonable or actual belief that she was concealing anything, as

she arrived at the Jail already nude; (ii) Colo. Rev. Stat. § 16-3-405(3) provides that "[a]ny strip

search that is conducted shall be performed by a person of the same sex as the arrested person

and on premises where the search cannot be observed by persons not physically conducting the

search," but Plaintiff's twelve (12) hour strip search was conducted by multiple male officers in

full view of numerous male officers and inmates; and (iii) Colo. Rev. Stat. § 16-3-405(4)

provides that before conducting a strip search, a peace officer "shall obtain the written

permission of… a sheriff or an agent thereof designated for the purposes of authorizing a strip

search in accordance with this section," but no such permission was sought or granted in

Plaintiff's case.

95.    Plaintiff was never informed why she was being detained.  It was not until her

hearing two days later on May 7, 2014 that Plaintiff finally learned she was being charged with

resisting arrest and disorderly conduct for "offensive utterances."

96.     These false, trumped up charges – resulting entirely from a situation that the

Defendants Fetterhoff, Johnston and Sanger themselves instigated and subsequently escalated –

were later dismissed for lack of probable cause.

97.     In his Findings and Order dated August 14, 2014, Fremont County Judge Norman

C. Cooling concluded that "the deputies lacked probable cause to arrest the defendant for

disorderly conduct based on the totality of the circumstances."

98.     Judge Cooling noted that "Disorderly conduct requires offensive conduct in a

*public place*.  [Ms. O'Neal] was under arrest (in custody) when handcuffed in her apartment, a

private place."

99.     Indeed, not only were these charges – as well as Ms. O'Neal's arrest and brutal,

humiliating and vindictive treatment in jail – all instigated and caused entirely by the Defendants'

own illegal actions, they also served to disguise the real reason for Ms. O'Neal's unlawful arrest

and detainment: the officers' retaliation against Ms. O'Neal's constitutionally protected

expression of protest against police misconduct.

100.    As a result of Defendants' blatantly illegal, brutal and humiliating actions, Ms.

O'Neal has suffered severe damages.

## C.  FREMONT COUNTY SHERIFF'S OFFICE'S PRACTICE, CUSTOM AND

### POLICY OF EXCESSIVE FORCE

101.    Fremont County Sheriff James Beicker and Undersheriff Ty Martin have created, fostered, maintained and tolerated an environment and culture of law enforcement brutality and deliberate indifference to the constitutional rights of its citizens and residents.

102.    Fremont County law enforcement officers have repeatedly and unlawfully used excessive force against citizens, targeting in particular its most vulnerable citizens—individuals with mental and other disabilities.

103.    Fremont County law enforcement officers have engaged in a persistent practice of law enforcement misconduct, and the officials responsible for assuring that such misconduct does not occur have consistently failed to properly train, supervise, and discipline individual officers who have engaged in such misconduct.

104.    In addition to the excessive force used against Ms. O'Neal, this culture and environment of brutality and the lack of training, supervision, and discipline of law enforcement officers is evidenced by the incidents described below.

105.    Upon information and belief, in October 2013 an 18-year old, mentally disabled, severely autistic man with fetal alcohol syndrome was arrested by Fremont County Sheriff's Office law enforcement officers.  The young man was walking down the street with his hands in his pockets, minding his own business.  Fremont County officers approached him for no apparent reason and without probable cause.  The officers began shouting at him to take his hands out of his pockets and when he failed to do so, attempted to forcibly remove his hands

24

from his pockets.  As a result of his obvious and serious mental disabilities, the young man

attempted to run away.  In response, the officers violently tackled and handcuffed him, injuring

him and bruising his shoulders.  The young man never attacked or threatened the officers, yet he

was charged with 3rd degree assault, obstructing a peace officer and resisting arrest.  Consistent

with his numerous disabilities, he was later found incompetent to stand trial, and all charges

against him were dropped.  Upon information and belief, the officers involved were never

disciplined for targeting and attacking a mentally disabled man.

      106.     Upon information and belief, in April 2014, less than a month before Ms.

O'Neal's arrest and detainment, John Patrick Walter ultimately died because of numerous

violations of his Fourteenth Amendment rights during a 17-day stay at the Fremont County

Detention Center.  Upon information and belief, correctional staff at the Jail confiscated and

discontinued Mr. Walter's prescription medication, forcing him to go "cold turkey" and into life-

threatening drug withdrawal, utterly neglecting his severe and potentially fatal withdrawal

symptoms, allowing him to descend into a state of acute withdrawal psychosis, failing to protect

him from self-harm, using brutal and excessive force in response to his medical condition rather

than providing him with desperately needed medical care, inflicting serious injuries upon him,

ignoring his serious physical injuries and critical mental health needs, failing to ensure adequate

nourishment and hydration despite his own inability to meet those essential needs, disregarding

his obvious malnourishment and dehydration, detaining him under inhumane conditions of

confinement, otherwise forcing him to endure extreme and needless pain and suffering and

ultimately causing his death. Following this cruel and callous treatment at the hands of Jail staff, Mr. Walter died alone and naked in his cell.

### D. FREMONT COUNTY SHERIFF'S OFFICE'S CUSTOM, POLICY AND PRACTICE OF FAILING TO TRAIN OFFICERS WITH RESPECT TO THE PROPER TREATMENT OF PERSONS WITH MEDICAL CONDITIONS, PHYSICAL OR MENTAL DISABILITIES AND/OR SUICIDAL THREATS

107.    Fremont County and the Fremont County Sheriff's Office have created, fostered, tolerated and maintained constitutionally deficient policies and neglected to train its employees with respect to the proper procedures for treatment of arrestees and detainees with medical conditions, physical or mental disabilities and/or suicide threats.

108.    Fremont County law enforcement officers have engaged in a persistent practice of law enforcement misconduct with respect to the treatment of detainees with serious medical and/or mental health needs, and the officials responsible for assuring that such misconduct does not occur have consistently failed to properly train, supervise, and discipline individual officers who have engaged in such misconduct.

109.    Specifically, although the Fremont County Sheriff's Office has a written policy with respect to Suicide Prevention and Intervention in its Standard Operating Procedures Manual, at all times relevant to this action, Fremont County provided no training whatsoever for officers on this subject. Further, Jail staff did not receive training with respect to medical screening or the proper treatment of and reporting of inmates' serious medical and/ or mental health conditions.

26

110.     Fremont County law enforcement officers have repeatedly and unlawfully failed to accommodate and, with deliberate indifference, ignored the serious medical and/ or mental health conditions and disabilities of its inmates, which has resulted in multiple unnecessary suicide attempts, deaths and serious injuries in the Jail, some of which are detailed below.

111.     As described in paragraph 115 above, John Patrick Walter died in the Jail in April 2014, in part because Jail staff failed to provide his prescription medications and then repeatedly ignored his serious and obvious medical and mental health needs.

112.     Upon information and belief, in April 2014, a diabetic woman was detained in the Jail.  Because Jail staff refused to provide her with needed insulin and then ignored her obvious medical distress, the woman suffered seizures and eventually required a toe amputation.

113.     Upon information and belief, in January 2015, a 65-year old, blind man died in the Jail due to an intestinal rupture.  Although he was in severe and obvious pain, Jail staff ignored his condition and refused to provide or call for any medical attention.

114.     Upon information and belief, in October and November 2015, respectively, two men with serious and known mental illness jumped from the second story of "J-Pod" in apparent suicide attempts.  As a result of Jail staff's failure to protect the inmates from self-harm, one of the men fractured his femur and the other man cracked his skull.

115.     On March 17, 2016, Gregory Smith, 57, collapsed and died while working in the Jail kitchen.  An investigation is underway and results will confirm his cause of death and whether it could have been prevented had Jail staff provided needed medical care.

**STATEMENT OF CLAIMS FOR RELIEF**

27

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Fourth Amendment Violation –

### Unlawful Seizure / False Arrest

### (Against Defendants Fetterhoff, Johnston and Sanger)

116.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

117.    Defendants Fetterhoff, Johnston and Sanger were all acting under color of state law in their actions and inactions that occurred at all times relevant to this action.

118.    At no relevant time did any of Defendants Fetterhoff, Johnston or Sanger have probable cause or reasonable suspicion, or any other legally valid basis, to believe that Plaintiff had committed or was committing any violation of the law prior to seizing and continuing to illegally restrain her person.

119.    At no relevant time did Defendants Fetterhoff, Johnston or Sanger have a reasonable basis for believing that Plaintiff was an imminent danger to herself or others.  No exigent circumstances existed justifying the Defendants' unlawful entry.

120.    At no relevant time did any of Defendants Fetterhoff, Johnston or Sanger have a warrant authorizing any seizure of Plaintiff's person.

121.    At no relevant time did Plaintiff give her consent for any officers to enter her residence.

122.    During the seizure at issue, Defendants Fetterhoff, Johnston and Sanger forcibly and intentionally restrained and arrested Ms. O'Neal against her will, despite lacking any legally valid basis for their actions.

123.    Defendant Fetterhoff's, Johnston's and Sanger's actions were objectively unreasonable in light of the circumstances confronting them, and violated clearly established law of which reasonable officials in their positions would have known.

124.    Defendants Fetterhoff, Johnston and Sanger engaged in their respective actions and inactions intentionally, willfully and wantonly.

125.    Plaintiff has been and continues to be damaged by these Defendants' unreasonable seizure of her, including but not limited to severe mental and emotional distress.

126.    The acts and omissions each Defendant described herein were the legal and proximate cause of Plaintiff's damages.

## SECOND CLAIM FOR RELIEF

## U.S.C. § 1983 – Fourth Amendment Violation –

## Excessive Force

## (Against Defendants Fetterhoff, Johnston and Sanger and the Fremont County Defendants)

127.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

128.    Defendants Fetterhoff, Johnston and Sanger were acting under color of state law in their actions and inactions that occurred at all times relevant to this action.

129.    At the time when Plaintiff was unlawfully seized, violently pushed down onto her bed naked, had her arms grabbed roughly behind her back and excessively tightly handcuffed and thrown into a police vehicle by Defendants Fetterhoff, Johnston and Sanger, Plaintiff had a

clearly established constitutional right to be secure in her person from unreasonable seizure through excessive force.

130.    Any reasonable law enforcement officer knew or should have known of this clearly established right.

131.    Defendants Fetterhoff, Johnston and Sanger engaged in use of force that was objectively unreasonable in light of the facts and circumstances confronting them, violating Plaintiff's Fourth Amendment rights.

132.    Defendants Fetterhoff's, Johnston's and Sanger's actions, as described above, were motivated by intent to harm Plaintiff and retaliate against Plaintiff for her constitutionally protected expression of protest at Defendants' illegal entry and seizure of her person.

133.    Defendants Fetterhoff's, Johnston's and Sanger's respective actions and inactions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights.

134.    The acts and omissions of each Defendant described herein, were the legal and proximate cause of Ms. O'Neal's damages.

135.    The acts and omissions of Defendants were engaged in pursuant to the custom, policy, and practice of Fremont County, which encourages, condones, tolerates, and ratifies the use of excessive force by law enforcement officers.

136.    The acts or omissions of the Fremont County Defendants caused Plaintiff damages in that she suffered pain and humiliation during and after her arrest, resulting in serious trauma.

### THIRD CLAIM FOR RELIEF

### U.S.C. § 1983 – Fourth and Fourteenth Amendment Due Process Violation – Excessive Force

### (Against Defendants Ulrich, Solano, Hammel, Gonzales, Bunch, Pohl and the Fremont County Defendants)

137.    Plaintiff incorporates all other paragraphs of this Complaint for purposes of this Claim.

138.    Defendants Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl were acting under color of state law in their actions and inactions that occurred at all times relevant to this action.

139.    At the time when Plaintiff was tackled to the ground and subsequently restrained naked in a restraint chair wearing only a spit mask and was being excessively forcibly handled by Defendants Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl, including the application of a "hypoglossal pressure point" technique and being tased twice on her right leg at close range, as a pre-trial detainee, Plaintiff had a clearly established Fourth and Fourteenth Amendment Due Process right to be secure in her person from the use of excessive force.

140.    Any reasonable law enforcement or correctional officer knew or should have known of this clearly established right.

141.    Defendants Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl engaged in use of force that was objectively unreasonable in light of the facts and circumstances confronting them, violating Plaintiff's Fourteenth Amendment rights.

142.    Defendants Ulrich's, Solano's, Hammel's, Gonzales', Bunch's and Pohl's respective actions, as described above, were motivated by intent to harm Plaintiff and retaliate against her for Plaintiff's constitutionally protected expression of protest of Defendants' illegal detainment and unlawful use of excessive force upon Plaintiff.

143.    Defendants Ulrich's, Solano's, Hammel's, Gonzales', Bunch's and Pohl's respective actions and inactions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights.

144.    The acts and omissions of each Defendant described herein, were the legal and proximate cause of Ms. O'Neal's damages.

145.    The acts and omissions of Defendants were engaged in pursuant to the custom, policy, and practice of Fremont County, which encourages, condones, tolerates, and ratifies the use of excessive force by law enforcement officers.

146.    The acts or omissions of the Fremont County Defendants caused Ms. O'Neal damages in that she suffered pain and humiliation during and after her arrest, resulting in serious injuries and trauma.

### FOURTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Violations of First and Fourteenth Amendments to United States

**(Against Defendants Fetterhoff, Johnston, Sanger, Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl)**

147.   Plaintiff incorporates all other paragraphs of this Complaint for purposes of this Claim.

148.   Plaintiff was engaging in constitutionally-protected activity at all relevant times, including but not limited to her protest of Defendants Fetterhoff's, Johnston's and Sanger's unlawful entry into her apartment and unlawful seizure of her person, and her protest against Defendants Ulrich's, Solano's, Hammel's, Gonzales', Bunch's and Pohl's illegal detainment and excessively violent treatment of Plaintiff while she remained in their custody at the Jail.

149.   Plaintiff's speech was related to a matter of important public concern.

150.   Defendants Fetterhoff's, Johnston's, Sanger's, Ulrich's, Solano's, Hammel's, Gonzales', Bunch's and Pohl's conduct was substantially motivated as a response to and in retaliation for Plaintiff's exercise of constitutionally-protected speech.

151.   Defendants Fetterhoff's, Johnston's, Sanger's Ulrich's, Solano's, Hammel's, Gonzales', Bunch's and Pohl's adverse actions in retaliation for Plaintiff's exercise of her free speech rights caused Plaintiff to suffer injuries.

152.   Defendants Fetterhoff's, Johnston's, Sanger's Ulrich's, Solano's, Hammel's, Gonzales', Bunch's and Pohl's conduct violated clearly established rights belonging to Plaintiff of which reasonable public officials knew or should have known.

153.    Plaintiff's right to speak out on issues of public concern outweighed any of Defendants' interests.

154.    Defendants Fetterhoff, Johnston, Sanger, Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl engaged in the conduct described by this Complaint willfully and wantonly and in reckless disregard of Plaintiff's constitutional rights.

155.    Defendants' conduct legally and proximately caused significant injuries, damages, and losses to Plaintiff.

**FIFTH CLAIM FOR RELIEF**

**U.S.C. § 1983 – Fourteenth Amendment Due Process Violation –**

**Right to Bodily Integrity and Right to Privacy**

**(Against Defendants Fetterhoff, Johnston, Sanger, Ulrich, Solano, Hammel,**

**Gonzales, Bunch and Pohl)**

156.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

157.    Defendants Fetterhoff, Johnston, Sanger, Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl were acting under color of state law in their actions and inactions that occurred at all times relevant to this action.

158.    At the time Plaintiff was unlawfully seized and arrested while nude and then paraded outside naked but for a blanket by Defendants Fetterhoff, Johnston, and Sanger, and subsequently detained still completely nude in the Jail for approximately twelve (12) hours, during which time she was restrained in a restraint chair and clothed only in a spit mask, Plaintiff had a clearly established Fourteenth Amendment Due Process right to be secure in her person from unnecessary invasion of her privacy and bodily integrity.

159.     Any reasonable law enforcement or correctional officer knew or should have known of this clearly established right.

160.     Defendants Fetterhoff, Johnston, Sanger, Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl engaged in actions and inactions, including but not limited to never providing Plaintiff with an opportunity to clothe herself prior to and following her unlawful arrest, and then failing to provide her with a jail uniform promptly upon arrival to the Jail, forcing her to remain nude in full view of other jail staff and inmates for approximately twelve (12) hours, that are arbitrary, shock the conscience, and cannot be reasonably justified by any legitimate state interest, depriving Plaintiff of her Fourteenth Amendment rights.

161.     Defendants Fetterhoff's, Johnston's, Sanger's, Ulrich's, Solano's, Hammel's, Gonzales', Bunch's and Pohl's respective actions and inactions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights.

162.     The acts and omissions of each Defendant described herein were the legal and proximate cause of Plaintiff's damages.

## SIXTH CLAIM FOR RELIEF

### 42 U.S.C. § 12132, *et seq.* – Violation of Title II of the Americans with Disabilities Act of 1990, as Amended

### Unlawful Discrimination and Failure to Reasonably Accommodate

### (Against All Defendants)

163.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

164.    The Americans with Disabilities Act (hereinafter referred to as the "ADA"), 42 U.S.C. §§ 12101 *et seq.*, and specifically 42 U.S.C. §§ 12131-12134, prohibits discrimination in public services on the basis of disability. 42 U.S.C. § 12132 provides:

> Subject the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

165.    The ADA defines a "public entity" to include any state or local government or any department, agency, special purpose district, or other instrumentality of a State or local government, 42 U.S.C. § 12131(1). The Fremont County Sheriff's Office, the Jail and Fremont County each are a "public entity" within the meaning of the ADA.

166.    At all relevant times, Plaintiff was a person with a disability that substantially limits one or more of her major life activities, had a record of a disability, including but not limited to Panic Anxiety Disorder, PTSD and suicidal ideation, or was regarded as having a disability by Defendants.

167.    Plaintiff, with or without reasonable modifications to rules, policies or practices, met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the Defendants. Thus, Plaintiff was a "qualified individual with disabilities" within the meaning of the ADA, 42 U.S.C. § 12131(2).

168.    Plaintiff was qualified to participate in the services, programs, activities, and benefits provided to arrestees and detainees at the Jail within the meaning of Title II of the ADA.

169.    Defendants Fetterhoff, Johnston, Sanger, Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl were on notice regarding Plaintiff's potentially suicidal state of mind and anxiety stemming from the Defendants' actions and her Panic Anxiety Disorder and PTSD.

170.    Defendants Fetterhoff, Johnston, Sanger, Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl targeted and discriminated against Plaintiff on the basis of her disabilities and failed to reasonably accommodate her disabilities despite knowing that she suffered from a number of disabilities, including but not limited to Panic Anxiety Disorder, PTSD and possible suicidal ideation, and related impairments and conditions.

171.    These actions and inactions violated clearly established law under Title II of the ADA and its implementing regulations.

172.    Defendants Fetterhoff, Johnston, Sanger, Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl had no legitimate basis for violating Plaintiff's rights conferred by the ADA.

173.    The actions of Defendants Fetterhoff, Johnston, Sanger, Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl were objectively unreasonable in light of the circumstances confronting them.

174.    Defendants Fetterhoff, Johnston, Sanger, Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl engaged in these actions and inactions intentionally, willfully, and wantonly.

175.    Defendants Fetterhoff's, Johnston's, Sanger's, Ulrich's, Solano's, Hammel's, Gonzales', Bunch's and Pohl's actions and inactions were the proximate and legal cause of Plaintiff's injuries.

176.     At all times relevant herein, the actions of Defendants Fetterhoff, Johnston, Sanger, Ulrich, Solano, Hammel, Gonzales, Bunch and Pohl were engaged in pursuant to the custom, policy, and practice of Fremont County.

177.     The Fremont County Defendants failed to properly train, supervise and/or discipline their employees regarding the proper treatment of, and accommodations for, individuals with disabilities and, in particular, mental disabilities.

178.     This inadequate training, supervision, and/or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to the Fremont County Defendants.

179.     In light of the duties and responsibilities of the Fremont County Defendants' personnel, the need for specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendants Board of County Commissioners of Fremont County, Sheriff James Beicker and Undersheriff Ty Martin, respectively in their official capacities, are liable for their failure to properly train, supervise, and/or discipline their subordinate employees and agents.

180.     Such failure to properly train and supervise caused the violations of Plaintiff's federally-protected rights described herein, and constitutes an unconstitutional policy, procedure, custom and/or practice.

181.     Plaintiff has been and continues to be damaged by Defendants' unlawful conduct under the ADA.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award her all relief as allowed by law and equity, including, but not limited to the following:

a.  Declaratory relief and injunctive relief, as appropriate;

b.  Actual economic damages as established at trial;

c.  Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e.  Issuance of an Order mandating appropriate equitable relief, including but not limited to:

    i.  Issuance of a formal written apology from each Defendant to Plaintiff;

    ii.  The imposition of policy changes designed to avoid future similar misconduct by all Defendants;

    iii. The imposition of disciplinary action against appropriate employees of the Fremont County Defendants;

f.  Pre-judgment and post-judgment interest at the highest lawful rate;

g.  Attorneys' fees and costs; and

h.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 3rd day of May 2016.

KILLMER, LANE & NEWMAN, LLP
*s/ David A. Lane*

_____
David A. Lane
Eudoxie (Dunia) Dickey
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dlane@kln-law.com
ddickey@kln-law.com

*ATTORNEYS FOR PLAINTIFF*